IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Melissa Powell,                         )
                                        )    Civil Action No. 6:09-cv-0900-JFA-WMC
                        Plaintiff,      )
                                        )    **REPORT OF MAGISTRATE JUDGE**
            vs.                         )
                                        )
Michael J. Astrue,                      )
Commissioner of Social Security,        )
                                        )
                        Defendant.      )
_____ )

      This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

      The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)[2]), to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act, as amended (the "Act").

## ADMINISTRATIVE PROCEEDINGS

      The plaintiff protectively filed applications for disability insurance benefits (DIB) and for supplemental security income benefits (SSI) on January 21, 2005, alleging that she became unable to work on December 10, 2002. The applications were denied

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

[2]42 U.S.C. § 1383(c)(3) "incorporates the review provisions of 42 U.S.C. § 405(g)." *Melkonyan v. Sullivan*, 501 U.S. 89, 92 (1991).

initially and on reconsideration by the Social Security Administration (the "Administration"). Following a hearing on May 12, 2008, the administrative law judge (the "ALJ") found on July 23, 2008, that the plaintiff was not under a disability as defined in the Act. The ALJ's finding became the final decision of the Commissioner when it was approved by the Appeals Council on March 13, 2009. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant met the insured status requirements of the Social Security Act through December 31, 2007.
>
> (2)    The claimant has not engaged in substantial gainful activity since December 10, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).
>
> (3)    The claimant has the following severe combination of impairments: degenerative disc disease of the cervical and lumbar spines, diabetes mellitus with neuropathy, hypertension, obesity, anxiety and depression (20 CFR 404.1520(c) and 416.920(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> (5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with no more than occasional climbing, balancing, stooping, kneeling, crouching or crawling, she must avoid concentrated exposure to hazards (i.e., heights and dangerous machinery), and, as a result of her mental impairments, she is limited to simple, routine, repetitive (unskilled) tasks.
>
> (6)    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).
>
> (7)    The claimant was born on July 13, 1960 and was 42 years old, which is defined as a younger individual age 18-44,

2

on the alleged disability onset date (20 CFR 404.1563 and
416.963).

(8)     The claimant has at least a high school education and
is able to communicate in English (20 CFR 404.1564 and
416.964).

(9)     Transferability of job skills is not material to the
determination of disability because using the Medical-
Vocational Rules as a framework supports a finding that the
claimant is "not disabled," whether or not the claimant has
transferable job skills (See SSR 82-41 and 20 CFR Part 404,
Subpart P, Appendix 2).

(10)     Considering the claimant's age, education, work
experience, and residual functional capacity, there are jobs
that exist in significant numbers in the national economy that
the claimant can perform (20 CFR 404.1560(c), 404.1566,
416.960(c), and 416.966).

(11)     The claimant has not been under a disability, as defined
in the Social Security Act, from December 10, 2002 through
the date of this decision (20 CFR 404.1520(g) and
416.920(g)).

The only issues before the court are whether proper legal standards were

applied and whether the final decision of the Commissioner is supported by substantial

evidence.


## APPLICABLE LAW

The Act provides that, for "eligible"[3] adults, benefits shall be available to

those who are "disabled," defined in the Act as unable to "engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than" twelve months.   42 U.S.C. §§ 423(d)(1)(A) and

1382c(a)(3)(A).

---

[3]Eligibility requirements for DIB are found at 42 U.S.C. § 423(a)(1), and for SSI at 42 U.S.C.
§ 1382(a).

To facilitate a uniform and efficient processing of disability claims, the Act has, by regulation, reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Administration's official Listing of Impairments (20 C.F.R. Part 4, Subpart P, Appendix 1), (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520 and 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.*; *see also Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. Social Security Ruling (SSR) 82–61, 1975-1982 Soc. Sec. Rep. Serv. 836 (West 1983). The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5)(a); *see also id.* § 1382c(a)(3)(H)(i). He must make a prima facie showing of disability by showing that he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.* at 191-92.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d

4

1453, 1456 (4th Cir. 1990); *see also Richardson v. Perales*, 402 U.S. 389 (1971). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing* U.S.C. § 405(g)*; Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a  verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that his conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 42 years old when she alleges she became disabled (Tr. 22).  She has a high school education and has worked as a canteen hostess and assembler (*id.*).

### A.  Medical Evidence

The plaintiff's medical records reveal that she started treatment with Dr. Edward Booker, Jr., for routine medical care as early as 1983 (*see* Tr. 152-259).  She also saw Lee Ann Butts, F.N.P., and Dr. Christa Booker (hereinafter, "Dr. Christa"), who were

associated with Dr. Booker's practice. The plaintiff's visits were only occasional until 1998, when she began having trouble keeping her blood pressure regulated. In February 1999, the plaintiff discovered that she was diabetic (*see* Tr. 192). At this visit, she first complained of an inability to keep up with production demands at work and expressed her desire to work a different shift. The situation had made her tearful.

The plaintiff also complained of hand pain after being placed on a new machine at work and, on February 17, 1999, Dr. Booker diagnosed probable repetitive motion injury secondary to carpal tunnel (Tr. 191). He provided the plaintiff with splints and medications and advised her to consider changing her job. Dr. Booker provided the plaintiff with a leave of absence "long enough to see if her job can be changed or what her response to treatment is" (*id.*).

The plaintiff further consulted with Dr. Orlando Ricalde, a neurologist, in April 1999 (*see* Tr. 378), and, in May, a "Dr. Edwards" performed her carpal tunnel release (*see* Tr. 189). A medical record from Dr. Booker's practice later that month revealed no complaints or adverse findings. The plaintiff had been out of work since the last week of February.

In September 1999, the plaintiff left work due to congestion and fatigue (Tr. 188). At her request, Nurse Butts gave her a "work release" for six days (*id.*). The following month, the plaintiff returned to Nurse Butts with an upper respiratory infection (Tr. 186). She asked for a five-day leave of absence from work "since she's used up all available sick days at work" (*id.*).

On January 20, 2000, the plaintiff saw Dr. Booker with complaints of accelerated hypertension, feeling ill for several days, and "somewhat anxious for several [weeks]" (Tr. 185). Dr. Booker increased the dosage of the plaintiff's blood pressure medication and put her on Zoloft, advising her to stay out of work until she was seen again. The plaintiff came back a week later, "feeling reasonablly [sic] well" (Tr. 184). She and the

doctor discussed the amount of stress involved on her job, and Dr. Booker wondered if the plaintiff might not have to change jobs. He had no problem with her either returning to work or extending her leave another two weeks; the plaintiff remained on leave (*see* Tr. 183).

Upon her return to Dr. Booker, the plaintiff was still feeling reasonably well, but because her blood pressure was still high, the doctor extended her leave another five days (*id.*). The plaintiff was still on leave when she saw Nurse Butts on February 21, 2000, and the nurse further extended the leave upon finding no improvement in the plaintiff's blood pressure (Tr. 181). A further adjustment in medication finally brought the pressure under control (*see* Tr. 179-80).

At the plaintiff's April 17, 2000, visit with Dr. Booker, she first complained of paresthesias of her feet, which he believed to be possible peripheral neuropathy (Tr. 178). The plaintiff then returned to Dr. Ricalde, on June 2, 2000, complaining of increasing numbness and tingling in her feet, with a burning sensation in both legs (Tr. 374). The doctor interpreted a subsequent electromyograph/nerve conduction study as "essentially unremarkable . . . except for evidence of some bilateral paraspinal axonal loss in the L2/3 and L3/4" levels, perhaps indicative of a mild diabetic polyradiculopathy (Tr. 373). He recommended magnetic resonance imaging ("MRI").

On July 3, 2000, the plaintiff told Nurse Butts that she had changed shifts at work and "loves it – less stressful" (Tr. 176). She had no complaints then, or when she returned for routine check-up in January 2001 (*see* Tr. 175), and was still "doing very well" when she next saw Dr. Booker in July (Tr. 172). However, on July 11, 2000, back with Dr. Ricalde, the plaintiff complained of burning in her toes to her knees, not severe, but worse with prolonged sitting (Tr. 371). The plaintiff's June 26, 2000, MRI revealed a disc paraspinal to the left at L1/2 with hypertrophic changes, and a broad-based disc bulge at L5/S1 (see Tr. 371). Dr. Ricalde's diagnoses included burning paresthesias, L1/2 disc

projecting to the left, left broad based disc at L5/S1 and early degenerative joint disease (Tr. 372). He recommended medication and physical therapy.

When the plaintiff next saw Dr. Ricalde on January 16, 2001, she reported that her dysesthesias had improved and that physical therapy had been helpful (Tr. 369). However, she had recently had a slight increase in low back pain, with some radiation into her left lower extremity, and also some occasional, sudden weakness in the left lower extremity. Her low back pain generally did well except with twisting or heavy lifting. The plaintiff's examination was good, with full motor strength, negative straight leg raising and "excellent" vibratory sensation on both great toes (Tr. 370). Dr. Ricalde told the plaintiff to resume her exercise program and prescribed medication for her back pain. In a letter dated August 20, 2001, Dr. Ricalde stated that the plaintiff had diabetic neuropathy exacerbated by standing, and suggested that her standing be limited to two hours at a time (Tr. 368).

When the plaintiff saw Dr. Booker on October 8, 2001, her diabetes and hypertension were controlled, but she complained to the doctor of recent palpitations, dizziness and a feeling that her heart races (Tr. 169). The plaintiff also reported back and shoulder pain that Dr. Booker tied to a change in work duties, which he planned to address in a letter to her job. Ten days later, the plaintiff was back with increasing blood pressure, increasing blood sugar and vertigo, which she related to her job (Tr. 168).

The plaintiff's appointment on October 30, 2001, was with Dr. Christa, to whom she reported that she had been out of work for two weeks for physical therapy addressing her disc herniation (Tr. 166). The plaintiff had returned to work the day before, but with a recurrence of symptoms. Dr. Christa opined that the plaintiff "needs to remain out of work for remainder of [physical therapy] and until reevaluation by neurosurgeon" (*id.*). Two days later, the plaintiff told Dr. Booker that her back pain was better with being

out of work, and the doctor said that he would "fill out family medical leave act papers and write a letter regarding her work" (Tr. 165).

On November 26, 2001, Dr. Charles Sonu performed an anterior cervical decompression fusion and instrumentation on the plaintiff's cervical spine at levels C5-6 and C6-7 (Tr. 141-47). During the operation, Dr. Sonu noted severe degenerative disc disease at these levels with severe stenosis (Tr. 141). The plaintiff experienced neither intraoperative nor postoperative complications and was ambulatory upon discharge the next day (*id.*). The surgery resolved her arm pain (Tr. 141-42), and post-surgical x-rays revealed good healing of the fusion (Tr. 150).

The plaintiff was still in a cervical collar on January 16, 2002, when she next saw Dr. Booker, and was still out of work (Tr. 163). When she saw Dr. Sonu two days later, she reported that her neck was "much more comfortable" (Tr. 149). She declined physical therapy, explaining that she knew her home exercises, but by February 19, felt they were not helpful. In March, Dr. Sonu recommended both physical therapy and rehabilitation for her shoulder (Tr. 149).

The plaintiff also saw Dr. Booker in March 2002, concerned that her blood sugar and blood pressure were elevated due to her "getting 'flack' from work": "She was ready to return to work but they have told her there is nothing she can do. She is wondering about the possibility of needing to be on disability" (Tr. 162). Dr. Booker thought disability not "a bad idea given her current situation, two previous back surgeries,[4] neck surgery," carpal tunnel syndrome, diabetes and hypertension (*id.* (footnote added)). However, when the plaintiff returned a month later, she was "doing well and ha[d] no complaints" (Tr. 161). The plaintiff also had an eye exam that month, and the doctor first observed early macular pigmentary changes (Tr. 288).

---

[4]This is the only mention in the transcript of back surgery, and there are no medical records of any such procedure.

Dr. Sonu's treatment notes of April 30, 2002, reveal the plaintiff's examination findings as "benign" and x-rays showed her fusion appeared solid (Tr. 149). He released the plaintiff to return to her regular job as of May 6, 2002. The plaintiff told Dr. Booker on June 10 that she was "very happy" about being back to her original job, but she needed a "work excuse" stating that she needed an air-conditioned work environment to control her hypertension and diabetes (Tr. 160). A few days later, the plaintiff told Dr. Sonu that she was "very happy" with the results of her surgery, and he released her from his care (Tr. 148).

On July 9, 2002, the plaintiff was still "doing pretty well" and was "feeling much better at this time about work and her future overall" (Tr. 159). Dr. Booker observed that she was "well appearing" and "in good spirits" (*id.*). Both the plaintiff's diabetes and hypertension were well-controlled.

Although not due to return for three months, the plaintiff was back with Dr. Booker later that month, reporting that she had had a series of dizzy or weak spells (Tr. 158). A subsequent nuclear stress test was negative for coronary disease (*see* Tr. 210-11). In follow-up on August 9, the plaintiff told the doctor that she had been asymptomatic since her last visit (Tr. 157). He linked her symptoms to stress and prescribed Ativan. At the plaintiff's next visit, with Dr. Christa, she had been "doing well" and had only allergy-related complaints (Tr. 156).

Yet just nine days later, on September 25, 2002, the plaintiff told Dr. Christa about "problems at work with anxiety and panic attacks" (Tr. 155). The plaintiff had proposed another change at work, to an area "with less time pressure" (*id.*). Dr. Christa diagnosed the plaintiff with generalized anxiety disorder and possible panic disorder, and advised her to continue her medication. The doctor wrote, "I will dictate letter for patient supporting medical diagnoses and asking plant to cooperate with medical needs so that [the plaintiff] can remain a fulltime employee" (*id.*). The plaintiff also complained of

10

worsening numbness in her feet, but since her diabetes was "under excellent control," Dr. Christa planned to check her thyroid panel and B$^{12}$ level.

When the plaintiff returned on October 28, 2002, Dr. Christa described her phenomenon as "uncontrollable panic attacks which were aggravated by stress at work" (Tr. 154). However, the plaintiff had transferred to another department and was "doing very well, with "very few, if any panic attacks" and was "[o]verall feeling much better" (*id.*). She had no acute complaints. Dr. Christa's assessment was anxiety panic disorder, "controlled at present with environmental modification" (*id.*).

The plaintiff went to see Dr. Booker on November 21, 2002, reporting that she had been very anxious and that her employer had "taken her out of work" (Tr. 153). She was worried about losing her job, but indicated that her job caused much of her anxiety. Dr. Booker remarked, "She virtually worries herself sick" (*id.*). He believed that she was having anxiety attacks and renewed her Ativan.

In March 2003, the plaintiff started going to Rosa Clark Medical Clinic (hereinafter, "Rosa Clark") for her care (*see* Tr. 319). At her annual eye exam in April, her doctor observed that the plaintiff's baseline visual field study revealed no macular involvement impact (Tr. 285). Eye care records through March 2005 reveal no further degeneration in the plaintiff's eyes (*see* Tr. 275-283).

When the plaintiff was back at Rosa Clark on September 2, 2003, her main concerns were facial hair and oily skin, and her examiner advised increased exercise and weight loss (Tr. 317-18). She returned on December 16, 2003, and it was noted that she was compliant with her medications (Tr. 317). The plaintiff was next at Rosa Clark on April 13, 2004, for a routine check (*see* Tr. 316). She had no problems except for occasional palpitations and rosacea. Upon her return for re-check in October, she complained of back pain "since March" and some neuropathy (Tr. 314).

After a two-year absence, on December 9, 2004, the plaintiff returned to Dr. Booker's practice to "talk about her disability" (*see* Tr. 152); she had had just two other medical visits that year.  In addition to a litany of physical complaints and limitations, the plaintiff told Dr. Booker that she had not been able to find work since her factory job.  Her exam findings were benign, except that the doctor found her to be "slightly weak" neurologically (*id.*).  Nevertheless, in addition to her standing diagnoses of hypertension, diabetes and high cholesterol, Dr. Booker diagnosed the plaintiff with osteoarthritis of the back and neck, macular degeneration and anxiety with depression.  He advised her to continue her present medications and referred her to Vocational Rehabilitation ("Voc. Rehab.").

Upon review of the plaintiff's records in March 2005, a state agency psychologist concluded that the plaintiff did not suffer from either a severe affective disorder or a severe anxiety-related disorder (*see* Tr. 260-72 (citing Listings 12.04 and 12.06)).

On April 6, 2005, the plaintiff saw Dr. George Bruce, an orthopedist, for a consultative examination (*see* Tr. 299-303).  Dr. Bruce observed that the plaintiff walked with an erect, brisk gait, and got on and off the exam table without aid (Tr. 300).  The plaintiff stood 64-1/2 inches tall and weighed 268 pounds.  Her musculoskeletal exam was within normal limits, with full ranges of motion except for a slight decrease in cervical flexion (*see* Tr. 300-01).  The doctor described the plaintiff's grip strength as "excellent bilaterally" (Tr. 301).

Dr. Bruce was unable to palpate any muscle spasms (Tr. 300-01).  The plaintiff exhibited no difficulty with heel-to-toe walking and no sensory deficits (Tr. 301).  X-rays of her lumbar spine showed mild to moderate degenerative arthritis involving the mid-back. Dr. Bruce believed these findings compatible with increased low back pain upon repetitive stooping, squatting, bending or lifting of more than 25 pounds.

After review of the plaintiff's records, a state agency medical consultant concluded on May 3, 2005, that she could perform work at the "medium" level of exertion (*see* Tr. 305). Because of the plaintiff's "morbid" obesity, he suggested that she be limited to only occasional postural movements (Tr. 306), and avoid concentrated exposure to hazards (Tr. 308). A second consultant would affirm the medium work finding on September 12, but recommend less restrictive postural and environmental limitations (*see* Tr. 361-64).

Back at Rosa Clark on May 3 (her first visit in 2005), the plaintiff was "doing well" (Tr. 313). The examiner advised her to continue regular medication for arthritis, and again stressed the importance of calorie reduction and daily exercise. On September 12, 2005, a second state agency consultant, citing findings from Dr. Bruce's examination, also determined that the plaintiff could perform medium work, the only restriction being that the plaintiff be limited to occasional climbing (*see* Tr. 361-62).

The plaintiff pursued treatment of her mental symptoms with the Oconee Mental Health Clinic (hereinafter, the "Clinic") on May 23, 2005 (*see* Tr. 337-42). She described her symptoms as "gets agitated, nervous, heart races, sick at stomach, trouble breathing" (Tr. 339). The plaintiff explained that she started having panic attacks when she was moved at work and could not keep up, but they continued after she lost her job. She added that she was tearful, had an increased need for sleep, and experienced mood swings.

The plaintiff reported that she lost her job because she was "unable to keep up" and "missed too many days" secondary to neck surgery and her nephew's death in a car accident (Tr. 340). She said that her arthritis had worsened since she stopped working, and she spent time with family members and with church activities.

The plaintiff listed additional symptoms as restless, easily fatigued, irritability and difficulty concentrating (Tr. 341). She said that she had always been nervous, but

recently her anxiety had turned into panic attacks (Tr. 342). Upon mental status examination, she was calm, her affect appropriate, and her speech of normal rate and tone (Tr. 341). The plaintiff was alert and oriented on four planes, and her thought process was relevant. The examiner, Linda Williford, R.N., found the plaintiff to have good judgment, but poor memory and concentration, and placed her "GAF" at 65.[5] Nurse Williford recommended that the plaintiff undergo outpatient care (Tr. 342).

On August 4, 2005, David Cannon, Ph.D., conducted the plaintiff's consultative psychological examination (*see* Tr. 343-45). He found the plaintiff to be cooperative, her affect broad, her mood unremarkable, and her speech and appearance within normal limits (Tr. 343). The plaintiff reported intermittent depressive symptoms of sad mood, feeling useless, crying spells, excessive sleep and some suicidal ideation. Her anxiety manifested as intermittent tachycardia, breathing difficulty, fearfulness and sweaty palms. The plaintiff had taken Ativan in the past, but could no longer afford it. Nevertheless, she had experienced recent improvement in her anxiety, but decline in her memory (Tr. 344).

Dr. Cannon's mental status examination revealed that the plaintiff was oriented times three; she had adequate reality contact; her insight and judgment appeared intact; and her thoughts were orderly. The plaintiff told Dr. Cannon that she carried out self-care activities, could manage money and prepared meals. He diagnosed the plaintiff with panic disorder, not otherwise specified, and adjustment disorder with depressed mood. Dr. Cannon concluded that the plaintiff would be able to maintain "concentration and pace sufficiently to complete tasks in a timely fashion in a work environment" (Tr. 344).

---

[5]"GAF" – "Global Assessment of Functioning" – ranks psychological, social and occupational functioning on a hypothetical continuum of mental illness ranging from zero to 100. A GAF score of 61 to 70 indicates "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning ... but generally functioning pretty well." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000).

Thereafter, a second state agency psychologist opined that the plaintiff's mental impairments were not severe (Tr. 346).

On August 9, 2005, a Clinic "Progress Summary" noted that the plaintiff had been compliant with treatment,[6] and rated her GAF at 65 (Tr. 422). Two days later, the plaintiff underwent an initial evaluation at the Clinic for medication purposes (*see* Tr. 420-21). She explained that she had not been able to get medication for her depression at Rosa Clark because it did not dispense controlled substances (Tr. 420), so she was using "Valerian," an over-the-counter herbal preparation, and it helped. The examiner diagnosed her with anxiety, not otherwise specified, and depression, not otherwise specified, and prescribed Visteral. The following week, the plaintiff went to Rosa Clark for medication refills (Tr. 393).

When the plaintiff returned to the Clinic on October 4, 2005, although she said that Visteral "helps," the examiner added Effexor (Tr. 419). She went to Rosa Clark on December 12, complaining of a growth on her ear (Tr. 393) – just her third visit in 2005. On the next day, the plaintiff was back at the Clinic for a medication check (*see* Tr. 415). She was "in good spirits," and she reported that "things [were] better," she was sleeping okay, and she had no side effects from her medications (Tr. 415).

The plaintiff went to the Clinic in January and February 2006 for medication samples (Tr. 413-14), and to Rosa Clark on March 3, 2006, for a routine visit, complaining only of some right upper extremity weakness (Tr. 392). She continued going to the Clinic about every month for her medication (*see* Tr. 395-415). In April, she was in good spirits with an "ok" mood (Tr. 412). The plaintiff had a routine visit at Rosa Clark in May, without complaints, and her hypotensive episodes were addressed by a modification of her medication (Tr. 391; *see* Tr. 390).

---

[6]The transcript contains no "treatment" records between the plaintiff's May 23, 2005 intake and this record.

Back at Rosa Clark in July 2006, the plaintiff complained of only occasional lightheadedness (Tr. 390). At the end of the month, the Clinic Progress Summary recorded the plaintiff's statement that "she is doing well [and] keeps busy by caring for her family" (Tr. 404). Her GAF was at 67. In fact, on August 8, 2006, the plaintiff said that she had been busy babysitting for her niece, her mood was good, and she had no side effects (Tr. 410).

The plaintiff's routine visit at Rosa Clark in September 2006 (Tr. 389), and at the Clinic in October (Tr. 409), were unremarkable. Her November Progress Summary noted that she continued to be compliant, continued to report doing well, and maintained her progress (Tr. 404). The plaintiff's GAF was 70, and the note ended, "Will plan to work toward discharge" (*id.*).

The plaintiff continued her periodic routine visits at both Rosa Clark and the Clinic through January 2008 (*see* Tr. 385-88; 395-401). In January and April 2007, she reported doing "pretty good" and "fairly well" and just needed her medications refilled (Tr. 401). In January 2008, she was still "doing well" and eating and sleep well, and had "[n]o complaints" (Tr. 395).

The plaintiff's next appointment was not until April 2008; her Clinic visit was uneventful (*see* Tr. 394). However, on April 28, Dr. Booker completed the Administration's "Psychiatric Review Technique," opining that the plaintiff meets Listings 12.04 and 12.06 (Tr. 423). He stated that, as a result of her mental impairments, the plaintiff suffered from "marked" restriction of activities of daily living; "extreme" difficulties in maintaining social functioning; "marked" difficulties in maintaining concentration, persistence or pace; and three episodes of decompensation, each of extended duration (Tr. 433).

In addition, on May 5, 2008, Dr. Booker wrote a letter on the plaintiff's behalf (*see* Tr. 435). He dated their medical relationship to 1981. He opined that, when he last saw her in December 2004, she was "disabled" by "her multiple medical illnesses," being

"disabling arthritis, which has resulted in her not being nearly as functional as she once was"; and "disabling panic attacks and depression," with "frequent panic attacks . . . despite medications" (*id*.). He added that she frequently had leg numbness and irritation and "sore joints throughout her body," along with decreased grip strength and "increased swelling at her femur joints" (*id*.).

## B. Administrative Hearing Testimony

The plaintiff was represented by counsel at her May 12, 2008 hearing (*see* Tr. 454). She testified that she stopped working because she ran out of sick leave and also had to miss work to attend her nephew's funeral (Tr. 463). She stated that her anxiety disorder caused her to have panic attacks two to three times a week (Tr. 464-65, 476). Both her mental and physical problems worsened at the end of 2002, and she started having problems keeping up with production requirements at work (Tr. 465).

The plaintiff testified that she has neuropathy in her feet and pain in her hip, and can sit for only 15 to 20 minutes at a time (Tr. 466). She collected unemployment benefits for a year after she stopped working and applied for jobs, but was not hired (Tr. 468). The plaintiff went to Voc. Rehab., but told them she could work for only one to two hours at a time, so was sent away (Tr. 492).

The plaintiff discussed her history of carpal tunnel surgery, neck surgery and low back pain, which she treats with over-the-counter medication (Tr. 468-73). She needs to lie down because of her pain everyday (Tr. 472). She goes to church and the grocery store once a week (Tr. 483). The plaintiff had not seen Dr. Booker since December 2004 (Tr. 486). Her mental health medications, though helpful, cause drowsiness (Tr. 490). She can neither stand nor sit for long (Tr. 474), but does not utilize an assistive device (Tr. 491).

The ALJ presented to vocational expert Karl Weldon (the "VE"), a hypothetical claimant of the plaintiff's age, education and work experience who retained the

residual functional capacity ("RFC") to perform unskilled sedentary work with postural activities required no more than occasionally and no concentrated exposure to hazards (Tr. 494- 95). The VE testified that jobs existed which such an individual could perform, citing as examples sorter and assembler jobs, and he provided the incidence of these jobs in the regional and national economies (Tr. 495).

## ANALYSIS

The ALJ concluded that the plaintiff was not disabled within the meaning of the Act, finding that she had the RFC to perform unskilled sedentary jobs such as sorting jobs and assembler jobs (Tr. 23). The plaintiff argues that the ALJ erred by failing to (1) give controlling weight to Dr. Booker's opinion, and (2) present the VE with a proper hypothetical.

### *Treating Physician Opinion*

The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b) and 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion, 20 C.F.R. §§ 404.1527(d)(2)-(5) and 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the Listing requirements or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 61 Fed. Reg. 34471-

01, 34474.  Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case.  *See* 20 C.F.R. §§ 404. 1527(d)(2) and 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  SSR 96-2p, 61 Fed. Reg. 34490-01, requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion.  *Id.* at 34492.  As stated in Ruling 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at 34491.

Since the plaintiff's alleged onset of disability in December 2002, she has been regularly treated at Rosa Clark.  During the relevant period, the plaintiff has received all of her mental health care from the Clinic.  Yet the only examiner's opinions in the record come from Dr. Booker, whose opinions the ALJ accorded "absolutely no weight" (Tr. 21).  The plaintiff appears to argue that the ALJ should have given Dr. Booker's opinion controlling weight because, as her "treating physician for over twenty years [he] has opined based upon the totality of his treatment and knowledge of the Claimant" (pl. brief 6).

Although the length of the treatment relationship is a factor to be considered when weighing a medical opinion, it alone is not sufficient. As explained by the ALJ, "Dr. Booker's opinions are not supported by the overall evidence" (Tr. 22). The doctor opined as to the plaintiff's mental health, but her anxiety did not lead to her job termination, and never even caused an extended absence from work. Dr. Christa did not diagnose her with generalized anxiety disorder, possible panic disorder, until September 25, 2002 (Tr. 155). The plaintiff wanted to "change [work] areas to one with less time pressure" (*id.*). She was apparently successful, because her next medical record reveals that she had transferred to another department and was "doing very well" (Tr. 154).

It was not the stress of the plaintiff's work that ended her job but, rather, the many months that she was out of work from just February 1999 through May 2002. (*See* Tr. 340 (lost her job because she was "unable to keep up" and "missed too many days"); Tr. 463 (was terminated because "I had used up all my medical sick leave")). *See also Banks v. Massanari*, 258 F.3d 820, 825 (8th Cir. 2001) (upholding denial of benefits where claimant worked with impairments and had not been discharged because of impairments but was fired for other reasons). The plaintiff's belief that she could still work thereafter is evidenced by her testimony that she looked for a job "for about a year" (Tr. 485).

Dr. Booker stated that the plaintiff suffered from "disabling panic attacks and depression" (Tr. 453), but her mental health treatment records are to the contrary. There are several notations of how "well" the plaintiff was faring (*see, e.g.*, Tr. 395, 401, 404), and her lowest recorded GAF was just 65. The doctor also said that she took Valerian to treat her mental impairments, but it did not "control all of her symptoms or manage her anxiety well" (Tr. 435). However, the plaintiff's treatment plan at the Clinic included prescription medications, which she took throughout (*see* Tr. 394-96, 401, 409-17), and testified helped (Tr. 490).

Moreover, in contrast to Dr. Booker's assertion (*see* Tr. 435), there is no mention in the records that the plaintiff feared leaving the house or could not be around others for very long. In fact, the plaintiff testified that she went grocery shopping and to church weekly, occasionally attended church programs, visited with her grandmother on Saturdays, and drove her mother to different appointments (Tr. 477, 483, 487, 489). In addition, there is only one notation of a missed appointment in the plaintiff's 25 years of medical records.

Finally, as noted by the ALJ (Tr. 22), Dr. Booker is a family practitioner, not a psychiatrist or a clinical psychologist. Dr. Cannon, who conducted a psychological examination of the plaintiff during the relevant period, opined that she would have no difficulty in self-care, social functioning, or maintaining concentration and pace (Tr. 344).

Although he admittedly has a long history with the plaintiff, Dr. Booker's opinion of her current condition is undermined by his added notation that "[a]s long as six years ago she was seen" (Tr. 435). Indeed, Dr. Booker's last medical record on the plaintiff pre-dated his letter by 3½ years (December 2004), and she actually ended treatment with him some two years prior to that (November 2002). Moreover, Dr. Booker found the plaintiff to be "disabled" by "her multiple medical illnesses," at her last visit (Tr. 435); yet his examination findings at that time were mostly benign (Tr. 152). *See Craig v. Chater*, 76 F.3d 585, 592 (4th Cir. 1996) ("'[S]ubjective evidence of pain cannot take precedence over objective medical evidence or the lack thereof'" (citation omitted)).

The plaintiff says that she "continued under the care of Dr. Booker as her primary physician" (pl. brief 4), but the record does not support her averment. The doctor described the plaintiff's arthritis as "disabling" (Tr. 435), but there are only three mentions of musculoskeletal issues throughout all of the relevant period. Specifically as to Dr. Booker's finding of decreased grip strength, the consulting orthopedist found the plaintiff's grip strength "excellent bilaterally" (Tr. 301). Although Dr. Booker declared the plaintiff

unable to perform fine manipulation or carrying, pulling or pushing (Tr. 435), he provides no specific reason for these restrictions, and none appear in the record. Even Dr. Booker acknowledged that the plaintiff's diabetes and blood pressure were controlled.

Dr. Booker wrote that the plaintiff had consulted with Voc. Rehab., but was "basically told . . . that they would not have anything for her" (*id.*). He added that Voc. Rehab. "refused to look for her other employment or train her to do anything else, given her degree of illness" (*id.*). Indeed, the plaintiff testified that she did go to Voc. Rehab., and was told that they would not have anything for her, but because the plaintiff told Voc. Rehab. that she would "be lucky to work maybe one or two hours at the most" (Tr. 492). Dr. Booker added that the plaintiff "has not found any type of employment which is willing to take her" (Tr. 435), but there is no indication that this was based on the plaintiff's limitations, as the plaintiff said that she was never interviewed for a job (Tr. 485).

Moreover, the plaintiff represented that she lost her job due to excessive time from work (*see, e.g.,* Tr. 340, 421, 463), but the impairments that caused the plaintiff's absences have all been successfully treated. The carpal tunnel syndrome, which put her out of work from February through May of 1999 was treated with surgery. There is no evidence that the plaintiff thereafter sought treatment for hand pain, and Dr. Bruce found that she had an excellent grip. There is also no evidence that the plaintiff continues to be plagued by upper respiratory symptoms that require treatment and extended leave.

The plaintiff's hypertension, responsible for her absence in January and February 2000 is well-controlled with medication. Her leave in October 2001 was due to back pain, treated successfully with physical therapy. The plaintiff was out from November 2001 through May 2002 due to her neck surgery, recovery and physical therapy, but she was pleased with the results of her surgery and returned to work thereafter without complaint. Clearly, there is substantial evidence to support the ALJ's decision to dismiss Dr. Booker's opinion.

*Hypothetical*

The ALJ asked the VE a number of hypotheticals, but at issue here is his limitation to "unskilled work due to combination of, of impairments or limitations" (Tr. 494). In his decision, the ALJ described the plaintiff's mental RFC as "limited to simple, routine, repetitive (unskilled) tasks" (Tr. 18). He arrived at this finding after rating the degree of functional limitation resulting from her mental impairments, as provided in 20 C.F.R. Sections 404.1520a and 416.920a (*see id.*). Significantly, the ALJ found that the plaintiff experienced moderate difficulties in maintaining concentration, persistence or pace, and "translated" this criterion "into work-related functions," *i.e.*, the limitation to simple, routine, repetitive tasks.

The plaintiff submits that the ALJ's description of "simple, routine, repetitive (unskilled) tasks" set out in his decision is not equivalent to the "unskilled" he used with the VE. She argues that her hypothetical to the VE more accurately describes her mental limitations:

> [M]ake the mental impairment severe to the point that she has poor memory and concentration therefore she would be unable to concentrate on a particular activity for longer than say 20 to 30 minutes. And that she would have to [sic] difficulty with her memory in remembering anything other than an easy one step type job.

(Tr. 497). The VE answered that such limitations would not allow the performance of competitive work.

"[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). There is no support for the plaintiff's description of her mental limitations, and the hypothetical posed to the VE need only reflect those impairments supported by the record. *See Hunt*

23

*v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001); *Barnett v. Apfel*, 231 F.3d 687, 690 (10th Cir. 2000); *Cass v. Shalala,* 8 F.3d 552, 556 (7th Cir. 1993). Dr. Booker's opinion supports the plaintiff's description, but the ALJ's decision to disregard it is supported by substantial evidence. On the other hand, Dr. Cannon, a psychologist, found that the plaintiff "should be capable of maintaining concentration and pace sufficiently to complete tasks in a timely fashion in a work environment" (Tr. 344). The ALJ gave Dr. Cannon's opinion "significant weight" as "consistent with the overall evidence" (Tr. 21).

That said, there is no sure way of knowing that the VE equated "unskilled work" with "simple, routine, repetitive" tasks. *See Boehm v. Comm'r of Soc. Sec.*, 626 F. Supp. 2d 1238, 1250 (S.D. Fla. 2009) ("The undersigned was not able to find any definition or description of unskilled sedentary work which explicitly limits such work to the performance of simple, repetitive tasks."). The Administration has defined "unskilled" work as

> work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs.

20 C.F.R. §§ 404.1568(a) and 416.968(a). *See also* SSR 82-41, 1975-1982 Soc. Sec. Rep. Serv. 847, 848 (West 1983) (distinguishing "unskilled" as requiring less than 30 days to learn); *Terry v. Sullivan*, 903 F.2d 1273, 1277 (9th Cir. 1990) (rejecting the Commissioner's definition of unskilled work as pertaining "only to work involving 'one type of repetitive job function,'" when he had "bound himself to the thirty day requirement in a variety of other regulations and official rulings"). As the Eighth Circuit Court of Appeals has explained,

> The Social Security's own list of unskilled sedentary jobs . . . indicates that many jobs within this range require more than the mental capacity to follow simple instructions. For each job described, the *Dictionary of Occupational Titles*[7] specifies the type of reasoning capabilities the job requires. 2 U.S. Dep't of Labor, *Dictionary of Occupational Titles*, 1010-11 (4th ed. 1991). For instance, a job rated reasoning level one requires the ability to understand and carry out simple instructions, whereas a job rated reasoning level two requires the ability to understand and carry out detailed instructions. *Id.* at 1011. Many of the jobs listed require level two reasoning or higher in the unskilled sedentary job category.

*Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir. 1997) (footnote added). *But see Hackett v. Barnhart,* 395 F.3d 1168, 1176 (10th Cir. 2005) (holding that reasoning level two "appears more consistent with" limitation of "simple and routine work tasks").

It appears to the court that "simple, routine, repetitive tasks" are a subset of "unskilled work," and thus the VE may have responded with jobs which exceed the plaintiff's mental RFC as the ALJ found it. Accordingly, upon remand, the ALJ should present a hypothetical to the VE which more specifically describes the plaintiff's mental limitations as he finds them.


## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.


May 4, 2010                                    s/William M. Catoe
Greenville, South Carolina          United States Magistrate Judge

---

[7]The *Dictionary of Occupational Titles*, a Labor Department guide to job ability levels that has been approved for use in Social Security cases, is the Commissioner's primary source of reliable job information. *See* 20 C.F.R. §§ 404.1566(d)(1) and 416.966(d)(1).